**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIFE FUND 5.1, LLC, *et al.,*[1] | ) | Case No. 09 B 32672 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 12, 2012** |
| | ) | **Hearing Time: 9:30 a.m.** |
| | ) | <u>**Objection Deadline: March  9, 2012**</u> |

**TO:  THE PARTIES ON THE ATTACHED SERVICE LIST**

**NOTICE OF HEARING ON APPLICATION OF
<u>JEFF J. MARWIL, CHAPTER 11 TRUSTEE, FOR COMPENSATION</u>**

PLEASE TAKE NOTICE that on **March 12, 2012, at 9:30 a.m.**, or as soon thereafter as counsel may be heard, the undersigned shall appear before the Honorable A. Benjamin Goldgar, Judge for the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, in Courtroom 613 of the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, 60604, or any other Judge who may be sitting in his place and stead, and then and there present for hearing the *Application of Jeff J. Marwil, Chapter 11 Trustee, for Compensation* (the "<u>Application</u>"), a copy of which is enclosed herewith and hereby served upon you.

---

[1]  The Debtors in the cases are: (1) Life Fund 5.1, LLC; (2) Life Fund 5.2, LLC; (3) A&O Life Fund, LLC; (4) A&O Resource Management, Ltd.; (5) A&O Bonded Life Settlements, LLC; (6) A&O Bonded Life Assets, LLC; and (7) Houston Tanglewood Partners, LLC.

Dated: February 17, 2012

Respectfully submitted,

PROSKAUER ROSE LLP

*/s/ Jeremy T. Stillings*

Jeremy T. Stillings (ARDC# 06279868)
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
(312) 962-3550, (312) 962-3551 (Fax)

*Counsel to the Trustee*

2

## CERTIFICATE OF SERVICE

I, Jeremy T. Stillings, an attorney, hereby certify that on February 17, 2012, I caused copies of the foregoing **Notice of Hearing** and the following **Application of Jeff J. Marwil, Chapter 11 Trustee, for Compensation** to be served upon those parties on the attached service list in the manner indicated therein.

Dated: February 17, 2012

By: _/s/ Jeremy T. Stillings_

| Served Via Court ECF System | |
|---|---|
| OFFICE OF THE US TRUSTEE<br>Richard C. Friedman<br>Sandra Rasnak<br>219 S. Dearborn St.<br>Room 873<br>Chicago, IL 60604-1702 | PERKINS COIE LLP<br>Brian A. Audette<br>David M. Neff<br>John M. Christian<br>131 S. Dearborn St.<br>Suite 1700<br>Chicago, IL 60603 |
| LANGLEY & BANACK INC.<br>David S. Gragg<br>Trinity Plaza II, 9th Floor<br>745 E. Mulberry<br>San Antonio, TX 78212-3166 | ARNSTEIN & LEHR, LLP<br>Michael Gesas<br>Miriam Stein<br>Barry Chatz<br>Kevin Morse<br>120 South Riverside Plaza<br>Suite 1200<br>Chicago, IL 60606-3910 |
| CHAPMAN & CUTLER LLP<br>David Audley<br>Carly Jones<br>111 W. Monroe<br>Suite 1600<br>Chicago, IL 60603 | FUNKHOUSER VEGOSEN LIEBMAN & DUNN, LTD<br>Daniel Graham<br>Neil Rosenbaum<br>55 W. Monroe St.<br>Suite 2300<br>Chicago, IL 60603 |

1124/51043-001 current/27120891v2

| Served Via Court ECF System | |
|---|---|
| GOULD & RATNER LLP<br>Mark E. Leipold<br>222 N. LaSalle St.<br>Suite 800<br>Chicago, IL 60601 | GROCHOCINSKI, GROCHOCINSKI &<br>LLOYD, LTD.<br>David E. Grochocinski<br>Ariane Holtschlag<br>1900 Ravinia Place<br>Orland Park, IL 60462 |
| HIRSCH & WESTHEIMER, P.C.<br>Michael J. Durrschmidt<br>Bank of America Center<br>25th Floor<br>700 Louisiana<br>Houston, TX 77002 | JOHNSON, TRENT, WEST & TAYLOR,<br>LLP<br>Lori Hood<br>Deborah Fritsche<br>919 Milam<br>Suite 170<br>Houtston, TX 77002 |
| JONES, MORRIS, LLP<br>Erin E. Jones<br>2700 Post Oak<br>Suite 1120<br>Houston, TX 77056 | KATTEN MUCHIN ROSENMAN LLP<br>Paige E. Barr<br>525 W. Monroe St.<br>Chicago, IL 60661 |
| OFFICE OF THE TEXAS ATTORNEY<br>GENERAL<br>Edith Stuart Phillips<br>Bankruptcy & Collection Division<br>P.O. Box 12548, MC-008<br>Austin, TX 78711 | SHAW GUSSIS FISHMAN<br>Gordon Gouveia<br>321 N. Clark<br>Suite 800<br>Chicago, IL 60654 |
| SMITH AMUNDSEN LLC<br>Brian M. Graham<br>Ean L. Kryska<br>Bryan Minier<br>150 N. Michigan Ave.<br>Suite 3300<br>Chicago, IL 60601 | VEDDER PRICE<br>Michael Eidelman<br>Arlene Gelman<br>222 N. LaSalle St.<br>Suite 2600<br>Chicago, IL 60601 |
| DRINKER BIDDLE & REATH LLP<br>Jeffrey M. Schwartz<br>Lionel Weaver<br>191 N. Wacker Dr., Ste. 3700<br>Chicago, Illinois  60606-1698 | |

| Served Via United States First Class Mail | |
|---|---|
| LENTZ & LITTLE, PA<br>William J. Little, Jr.<br>2012 23rd Ave.<br>Gulfport, Mississippi 39501 | Arturo C. Sapida<br>81870 Mountain View Lane<br>LaQunita, CA 92253-7610 |
| BLALOCK, WALTERS, HELD &<br>JOHNSON, P.A.<br>Mary Fabre Levine<br>802 11th Street West<br>Bradenton, FL 34205 | GIBBS & BRUNS LLP<br>Ashley McKeand<br>1100 Louisiana<br>Suite 5300<br>Houston, TX 77002 |
| BRACEWELL & GIULIANI LLP<br>Dean Tillostson<br>Tony Visage<br>711 Louisiana Street<br>Suite 2300<br>Houston, TX 77002 | FORIZS & DOGALI, P.A.<br>Zala Forizs<br>4301 Anchor Plaza Pkwy<br>Suite 300<br>Tampa, FL 33634 |
| GERSTNER & GERSTNER<br>J.Gerstner<br>M. Gerstner<br>Attorney For Nancy J. Groppi<br>53 W. Jackson Blvd.<br>Suite 1538<br>CHICAGO, IL 60604 | HAL F. MORRIS<br>Assistant Attorney General<br>Texas Attorney General's Office<br>P.O. BOX 12548, MC-008<br>Austin, TX 78711-2548 |
| IDEAL SETTLEMENTS CORP<br>Robert Taurosa, Agent<br>Or Other Officer Or Managing Agent<br>3401 Shoreline Drive<br>Allenwood, NJ 08720 | JACKSON WALKER LLP<br>Janet Douvas Chafin<br>1401 McKinney<br>Suite 1900<br>Houston, TX 77010 |

1124/51043-001 current/27120891v2

| Served Via United States First Class Mail | |
|---|---|
| Nancy J. Groppi<br>5837 Electric Avenue<br>Berkeley, IL 60163-1522 | US SECURITIES & EXCHANGE COMM.<br>Toby Galloway<br>Fort Worth Regional Office<br>801 Cherry St.<br>19th Floor<br>Fort Worth, TX 76102 |
| WALDRON & SCHNEIDER, LLP<br>Marc H. Schneider<br>Attorney to Troy Broussard & Ivo Dabelic<br>University Park 15150 Middlebrook Drive<br>Houston, TX 77058 | Patricia A. Navin<br>32 Mill Road<br>Hampton, NH 03842 |
| PHELAN HALLINAN & SCHMIEG, LLP<br>Judith T. Romano<br>1617 John F. Kennedy Boulevard<br>Suite 1400<br>Philadelphia, PA 19103 | PROVIDENT CAPITAL INDEMNITY LTD<br>Minor Vargas Calvo<br>Desarrollos Comerciales Ronim,SA<br>Oficinas Ejecutivas San Rafael<br>San Rafael-Heredia, Costa Rica |
| PROVIDENT CAPITAL INDEMNITY LTD<br>C/O Texas Secretary of State<br>as Agent For Service<br>P.O. Box 12887<br>Austin, TX 78711-2887 | Russell E. Mackert<br>5555 West Loop South<br>Suite 605<br>Houston, TX 77401 |
| Sumner Kai<br>11911 Pine Belt Dr.<br>Cypress, TX 77429 | Thomas G. Ferrell<br>3006 Carrie Cove Ct.<br>Spring, TX 77386 |
| THOMPSON & KNIGHT LLP<br>J. Brannon<br>K. Richter<br>1722 Routh St.<br>Suite 1500<br>DALLAS, TX 75201 | CLARK HILL PLC<br>Daniel T. Graham<br>150 N. Michigan Ave.<br>Suite 2700<br>Chicago, IL 60601 |
| Edward D. Hellekson<br>6889 Clearwater Rd. #104<br>Baxter, MN 56425 | Gerald J. Milliken Living Trust<br>c/o Gerald J. Milliken<br>2314 Central Blvd.<br>Merrick, NY 11566-3719 |

1124/51043-001 current/27120891v2

| Served Via United States First Class Mail | |
|---|---|
| John E. Spalding & Laura H. Spalding<br>JTWROS<br>1561 Kirby Drive<br>Houston, TX 77019 | Dan Pascal Vincent<br>3400 Travis St.<br>Houston, TX 77002 |
| Linda M. Cox<br>15827 Mesa Gardens Drive<br>Houston, TX 77095 | Bonnie E. Bryant<br>951 Armour Rd.<br>Oconomowoc, WI 53066-3935 |
| Marilyn T. Wasson<br>921 E. Manzanita Dr.<br>Union, WA 98592-9704 | Alan Nordby<br>114 Camargo Lane<br>Pasco, WA 99301-6114 |

1124/51043-001 current/27120891v2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIFE FUND 5.1, LLC, *et al.,*[1] | ) | Case No. 09 B 32672 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 12, 2012** |
| | ) | **Hearing Time: 9:30 a.m.** |
| | ) | **Objection Deadline: March 9, 2012** |

**COVER SHEET TO APPLICATION OF
JEFF J. MARWIL, CHAPTER 11 TRUSTEE, FOR COMPENSATION**

Name of Applicant:                    Jeff J. Marwil, as Chapter 11 Trustee

Authorized to Provide
Professional Services to:              Chapter 11 Estates

Date of Order Certifying Election:     March 8, 2010

Period for Which Compensation
is Sought:                            March 8, 2010 through January 27, 2012

Amount of Fees Sought
for Final Application Period:          $238,667

This is a:  _____  interim    __X__  final application.

Dated:  February 17, 2012             Respectfully submitted,

                                      */s/ Jeremy T. Stillings*
                                      Jeremy T. Stillings (#06279868)
                                      PROSKAUER ROSE LLP
                                      70 West Madison St., Suite 3800
                                      Chicago, IL  60602-4342
                                      312 962-3529
                                      312 962-3551 (facsimile)
                                      jstillings@proskauer.com
                                      *Counsel to Chapter 11 Trustee*

---

[1] The Debtors in the cases are: (1) Life Fund 5.1, LLC; (2) Life Fund 5.2, LLC; (3) A&O Life Fund, LLC; (4) A&O Resource Management, Ltd.; (5) A&O Bonded Life Settlements, LLC; (6) A&O Bonded Life Assets, LLC; and (7) Houston Tanglewood Partners, LLC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIFE FUND 5.1, LLC, *et al.*,[1] | ) | Case No. 09 B 32672 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 12, 2012** |
| | ) | **Hearing Time: 9:30 a.m.** |
| | ) | **Objection Deadline: March 9, 2012** |

### APPLICATION OF JEFF J. MARWIL,
### CHAPTER 11 TRUSTEE, FOR COMPENSATION

Jeff Marwil, not individually, but solely in his capacity as the elected chapter 11 trustee

(the "Trustee") to the estates (the "Estates") of the above-captioned debtors (collectively, the

"Debtors"), by and through his undersigned counsel and pursuant to sections 105, 326, and 330

of title 11 of the United States Code (11 U.S.C. §§ 101 *et. seq.*, the "Bankruptcy Code"), rules

2002(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

the Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Northern District of Illinois (the "Local Rules")[2], hereby submits this application (the

"Application") for final compensation for services rendered by the Trustee to the Estates for the

period of March 8, 2010 through and including January 27, 2012 (the "Application Period"), and

respectfully requests that this Court enter an order awarding $305,983 in trustee compensation

for the duration of the above-captioned chapter 11 cases (the "Chapter 11 Cases") and allocate

---

[1]  The Debtors in the cases are: (1) Life Fund 5.1, LLC; (2) Life Fund 5.2, LLC; (3) A&O Life Fund, LLC; (4) A&O Resource Management, Ltd.; (5) A&O Bonded Life Settlements, LLC; (6) A&O Bonded Life Assets, LLC; and (7) Houston Tanglewood Partners, LLC.

[2] Local Rule 5082-1 does not apply to the Trustee. Local Rule 5082-1 applies to "professional persons employed in a case filed under Chapter 7, 9, 11 or 12 of the Bankruptcy Code". The Trustee was elected, not retained or otherwise employed. This distinction is consistent with the plain text of the Bankruptcy Code; Section 330(a)(1) of the Bankruptcy Code distinguishes trustees from "professional persons employed under section 327 or 1103" of the Bankruptcy Code. Notwithstanding the foregoing, the Trustee provided the cover sheet required by Local Rule 5082-1 as a courtesy and to facilitate a review of the Application.

such award $238,667 to the Trustee for his services rendered to the Estates during the Application Period and $67,316 to his predecessor, Patrick Collins ("Collins"), for services Collins rendered to the Estates prior to the Application Period. In support of this Application, the Trustee respectfully states as follows:

## INTRODUCTION

1.    On January 27, 2012 (the "Effective Date"), the Chapter 11 Trustee's Second Amended Plan of Consolidation and Liquidation (the "Plan") became effective. The Plan is the culmination of the Trustee's administration and liquidation of the Estates and provides a mechanism for the Trustee to distribute to creditors approximately $5 million of cash of the Estates (as of the Effective Date). The bulk of this cash constitutes proceeds of the life insurance policies that formed the largest liquid assets of the Estates, the value of which the Trustee maximized (as described in greater detail below) for immediate distribution to creditors. Other material assets of the Estates include a $91 million claim against the PCI receivership estate (as defined and described below) and the tens of millions of dollars of claims against former principals of the Debtors and others, claims which cannot currently be monetized, but which have been transferred to the liquidating trust established by the Plan (the "Trust") and which may be monetized in the future in order to provide subsequent cash distributions to creditors.

2.    Pursuant to the Plan, substantially all assets of the Estates were transferred to the Trust for administration and distribution to creditors of the Estates. The Trustee is also the trustee of the Trust and has and will continue to work to maximize the value of Trust assets without further compensation as trustee of the Trust.

3.    For example, subsequent to confirmation of the Plan, the Trustee has negotiated allowance of a $91.6 million claim of the Trust (representing the original principal investment

and loss of the Debtors' investor creditors) against the receivership estate of Provident Capital

Indemnity Ltd. ("PCI") and facilitated the potential recovery by that estate of millions of dollars

of offshore assets.[3] During the Chapter 11 Cases and well prior to confirmation of the Plan, the

Trustee engaged Interfor, Inc. ("Interfor"), an international recovery specialist, to pursue the

discovery and recovery of suspected hidden offshore bank accounts in the name of the Debtors,

their former principals or affiliates, PCI, or its principals or affiliates. Subsequent to this

retention: (a) the Securities and Exchange Commission filed a civil suit against PCI and its

principals for fraud and other bad acts; (b) PCI was placed into federal receivership; (c) a

receiver (the "PCI Receiver") was appointed over the PCI estate; and (d) the PCI receivership

court issued an injunction that would prohibit the Trust and the Trustee from accessing property

in the name of PCI or its principals, even if the Trust could assert a direct and colorable claim to

such property under the laws of the United States or another nation. Hence, the Trustee

introduced the PCI Receiver to Interfor, coordinated the retention of Interfor by the PCI Receiver

on the same terms of Interfor's engagement with the Estates, and entered into a stipulation with

the PCI Receiver on the amount ($91 million) and treatment (*parri passu* with other investor-

creditors and subordinate only to administrative costs and expenses of the PCI estate) of the

Trust's claim against the PCI estate. This stipulation ensures that distributions that the Trust

receives from the PCI estate will be *pro rata* with distributions to other investor-creditors. The

Trustee believes that the Trust is the largest and majority creditor of the PCI estate. The

Trustee further believes that these efforts will significantly increase the return that creditors ultimately

will receive from the Trust, as Interfor has reported that it has located offshore bank accounts of

PCI (or its principals) holding tens of millions of dollars, and the PCI Receiver is in the process

---

[3] As described below, PCI issued guaranty bonds on many of the life insurance policies owned by the Debtors. PCI and its principals did so in furtherance of their own fraud.

3

of collecting on those accounts.

4.     Under his agreement with the Trust, Mr. Marwil will not receive compensation for serving in his capacity as trustee of the Trust.

### COMMENCEMENT OF CASES AND ELECTION OF THE TRUSTEE

5.     Prior to the Petition Date (as defined below), the Debtors purportedly operated in the "life settlement" industry, soliciting funds from individual investors in order to use such funds to acquire ownership of or beneficial interests in life insurance policies ("Policies") on third party insureds. As part of this purported business model, the Debtors also acquired bonds issued by PCI. Each PCI bond matured on a fixed date and in an amount equal to the death benefit of a Policy with which it was connected. The Debtors' purported business model was to: (a) borrow money from investors to finance the Debtors' purchase of Policies and PCI bonds; (b) purchase and maintain Policies and PCI bonds using investor dollars; (c) collect either death benefits (if there was no PCI bond on a Policy or if the Policy matured prior to the maturity of the PCI bond) or proceeds of the PCI bonds (if the PCI bond matured before maturity of the Policy on which it was issued); (d) use such proceeds to repay investors the principal amount of their investment plus a promised investment premium; and (e) keep the difference between the proceeds collected and investor funds repaid as profit.

6.     It is now apparent that for some time leading up to the Petition Date, the Debtors' business was a sham. Some principals of the Debtors have admitted to using the Debtors to commit, among others, crimes of fraud and money laundering and have pled guilty to criminal charges in connection with such criminal activity. Some principals of the Debtors have been convicted by the United States Department of Justice, acting through the Office of the Unites States Attorney for the Eastern District of Virginia, with crimes related to such activities.

4

Although some mystery surrounds exactly when and how the Debtors became unable to continue their enterprise, as of the Petition Date the Debtors apparently had no active management, very few hard assets, and were insolvent.

7.      On September 2, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Cases. Through the Effective Date, the Chapter 11 Cases were administered jointly for procedural purposes only under the case name and number assigned to Debtor Life Fund 5.1, CCL. The Plan substantively consolidated the Estates for all purposes.

8.      On September 16, 2009, this Court granted a motion of the office of the United States Trustee (the "United States Trustee") requesting appointment of a chapter 11 trustee under section 1104(a) of the Bankruptcy Code.

9.      On September 21, 2009, this Court approved the appointment of Collins as chapter 11 trustee.

10.      On March 8, 2010, after Mr. Marwil was elected Trustee by creditors of the Debtors, this Court entered an order certifying Mr. Marwil's election as Trustee.

## THE TRUSTEE'S SERVICES TO THE ESTATES

11.      Upon his election as Trustee, Mr. Marwil brought to bear his years of experience as a restructuring professional and his prior experience as a trustee of corrupt organizations to prioritize administration of the Estates to yield the maximum net return possible to creditors. Throughout the course of these cases the Trustee coordinated efforts with myriad federal, state and local investigative, enforcement and legal authorities. In so doing the Trustee engaged in information and document sharing that ultimately will benefit creditors of the Estates in multiple

5

ways, in addition to receipt of distributions from the Trust under the Plan. What follows are brief descriptions of some of the Trustee's most significant actions in these cases.

***Administration and Sale of Policies.***

12.     Due to his experience with maintaining and administering portfolios of life insurance policies in other bankruptcy cases, the Trustee identified as a top priority analyzing and quickly making an informed decision on how to administer the Policies, some of which would require premium or cost of insurance payments of thousands of dollars per month to maintain. Failure to quickly determine the best course for administering the Policies would have unnecessarily drained the Estates of cash spent on premium payments that ultimately would provide little or no benefit to the Estates. At the time the Trustee's election was certified by the Court, the Estates held approximately $675,000. The Trustee's first task was to work directly with the life insurance companies that issued the Policies and arrange for the Estates to pay only the minimum "costs of insurance" of each Policy, *i.e.*, the minimum amount of cash necessary to be paid to keep a Policy in good standing. The cost of insurance of a Policy (with respect to all of the Policies during the Chapter 11 Cases) was less than the scheduled premium payments due under the Policies. By paying costs of insurance instead of scheduled premium payments, the Trustee was able to: (a) ensure that each Policy would remain in force until the Trustee could make an informed decision on how to administer such Policy; and (b) preserve cash of the Estates.

13.     Having ensured that the Policies would remain in good standing, the Trustee next had to determine the highest and best disposition of each Policy. Working with his attorneys at Proskauer Rose LLP, his advisors at Melville Capital, and his advisors at Lewis & Ellis, Inc., the Trustee first refined the actuarial analysis of the Policies that projected how likely each Policy

6

was to monetize at various points in the future. The Trustee then designed and implemented a sale process that would allow him to discover the market value of each Policy (in a manner that met expectations of market participants likely to purchase Polices and satisfied disclosure and approval requirements of the Court and Bankruptcy Code). Comparing these two analyses and considering the costs of insurance and premium payments that would come due under each Policy, the Trustee had a framework to make an informed decision to sell, hold, or lapse each Policy.

14.     The Trustee's analyses revealed that the Estates' cash on hand was insufficient to continue to pay costs of insurance to maintain the Policies. The expected maturities of the Policies were sufficiently long and sporadic that projected revenues from expected maturities of the Policies would not have been sufficient to fund costs of insurance on the balance of the portfolio. Under a strategy to hold the Policies, the Trustee projected that all of the Estates' cash would be consumed by costs of insurance. Moreover, due to the nature of the Debtors' fraud, the manner in which certain of the Policies were acquired and/or maintained, and the lack of documents supporting the acquisition of some Policies, the Trustee was not certain that life insurance companies would not challenge the Estates' right to collect death benefits upon the maturity of any Policy. Costs of litigating the Estates' contested rights to collect death benefits would further erode the Estates' cash. Finally, the Trustee determined that it was not tenable to sell some of the Policies in order to finance costs of insurance of other Policies that would be held in the hopes that they would mature sooner than projected, as there was no meaningful basis on which the Trustee could select the Policies to hold. The Trustee determined that a strategy of selecting some Policies to hold in the hopes that they would mature prior to their expected maturity, and thus increase returns to creditors, would unreasonably risk the certainty of returns

7

to creditors that would be available by selling the portfolio, and thus was not in the best interests of creditors. The Trustee ultimately concluded that the certain value available from controlled sales of Policies,[4] when compared to the expected net value of holding such Policies for future sale or monetization, provided the Estates with the greatest expected recovery.

15.     In addition to realizing the greatest projected net value for the Policies, selling the Policies yielded additional benefits to the Estates. The liquid proceeds generated by these sales had the benefit of being available for immediate distribution under the Plan, instead of a delayed distribution of proceeds that would have resulted from a strategy to hold Policies for an indefinite time. The majority of creditors who contacted the Trustee with a preference on the matter strongly preferred an expeditious distribution. The Trustee also is aware that many creditors of the Estates are advanced in age, retired, or dependant (to some degree) on investment income, including investments made with the Debtors. The sale of Policies also allowed the Trustee to stabilize cash outflows from the Estates, which allowed the Trustee to minimize expenses and exert greater cash control over the Estates. Finally, selling the Policies eliminated costs related to tracking Policies and coordinating and communicating with the insurers that issued the Policies and (in some instances), co-owners of Policies.

16.     Accordingly, the Trustee consummated a series of sales that yielded in excess of $4 million of proceeds for the Estates.

***Management of Litigation Against Affiliates and Former Principals of the Debtors.***

17.     Upon his election, the Trustee adopted an adversary proceeding that already had been commenced by the Estates against affiliates and former principals of the Debtors. While the prepetition actions of the Debtors absolutely supported the civil allegations of the complaint, the

---

[4] Some policies that could not be sold were lapsed or held. Policies that were held had no continuing cost to maintain.

8

fact that multiple of the defendants to the complaint were facing criminal charges related to the same actions (and lengthy jail terms) raised questions as to the timing, cost and benefit of prosecuting the complaint expeditiously and vigorously.

18.    The Trustee coordinated his efforts (as and when appropriate) and cooperated with the office of the United States Attorney (the "US Attorney") prosecuting the criminal complaints against the individuals subject to the Trustee's civil case. The Trustee elected to proceed immediately on only a few of the multiple counts of the complaint in order to obtain control over certain life insurance policies that had been fraudulently transferred to an non-Debtor affiliate of the Debtors. After obtaining control of these policies, the Trustee tightly controlled litigation costs and maintained close contact with the US Attorneys in charge of the related criminal cases. The federal prosecutions of the former principals of the Debtors eventually resulted in findings of guilt (either by plea agreement or judgments after trial). The individuals criminally charged all received lengthy jail sentences and were ordered to pay tens of millions of dollars of restitution to victims of their crimes – the Debtors' creditors.

19.    The Trustee received assurances of the US Attorney that any cash proceeds of the criminal cases (including a few million dollars of proceeds of assets seized upon the defendants' arrests) would flow directly to the Debtors' victims, who were determined to be creditors of the Estates.[5] In late 2011 the Trustee, with minimal incremental cost because of (a) the criminal convictions already obtained by the US Attorney and (b) the failure of certain defendants to respond to the complaint, was able to obtain judgments on many counts in the civil cases and dismiss other counts. In so doing, the Trustee secured tens of millions of dollars of claims for

---

[5] The Trustee and his professionals coordinated with federal authorities and (a) provided the office of the US Attorney a reconciled register of claims of the Debtors' victims and (b) created a mechanism in the plan that will allow the Trust to distribute proceeds of the criminal forfeitures. It is currently unclear if the US Attorney and the DOJ will distribute money directly to victims (based upon the claims register provided by the Trustee) or turn money over to the Trust for cost-free distribution by the Trustee.

9

creditors of the Estates (both direct claims against former principals of the Debtors and assurances of federal prosecutors that proceeds of their claims would flow to creditors of the Estates) and resolved a significant adversary proceeding with minimal cost. On the Effective Date, all of these claims transferred to the Trust.

***Negotiations with PCI and PCI Receiver***

20.     Shortly after the Trustee's election, the Court approved two settlement agreements between the Trust and PCI. The two agreements provided for PCI to pay the Estates the aggregate amount of $11 million via installment payments on account of bonds that PCI previously issued to the Debtors and that had matured.[6] After the settlement agreements became effective, PCI began to default on certain of its payment obligations to the Estates. Moreover, the Trustee determined that PCI also was in default on millions of dollars of additional bond payments due to the Estates, which payments were not being made and which were outside the scope of the settlement agreements.

21.     To address PCI's non-payment, the Trustee engaged PCI's principal, Minor Vargas (resident of Costa Rica) via letter, telephone, and personal meetings in Chicago. As a result of these visits, the Trustee was able to obtain certain payments due under the settlement agreements between PCI and the Estates. Moreover, after PCI satisfied in full its obligations under one settlement agreement (after payment of $1 million), the Trustee negotiated to continue to hold as security for PCI's remaining payment obligations to the Estates the Policy that the Estates otherwise would have turned over to PCI upon receipt of such $1 million from PCI. After PCI subsequently defaulted on all of its payment obligations to the Estates under this second

---

[6] One settlement agreement required PCI to pay the Estates $1 million, at which point the Trustee would turn over to PCI a $1 million policy originally insured by PCI. The second settlement agreement required PCI to pay the Estates $10 million, at which point the Trustee would turn over to PCI a $10 million policy originally insured by PCI.

10

settlement agreement, the Trustee foreclosed the Estates' guaranty interest in the Policy and sold the Policy (generating approximately $113,000 of cash proceeds) to offset partially its damages.

22.    The Trustee cooperated with the Securities and Exchange Commission (the "SEC") in its investigation of Minor Vargas. In or around January of 2011, this investigation resulted in the arrest of Minor Vargas and the filing by the SEC of a civil action against PCI and its principals, including Mr. Vargas, alleging that PCI was a fraudulent enterprise. As described below, the Trustee is preparing to testify as a government witness in the upcoming trial. Upon the filing of the suit, however, the SEC sought and obtained appointment of a federal receiver (the "PCI Receiver") over PCI. In the months that followed, the Trustee worked closely with both the US Attorney and the PCI Receiver to reconcile the Estates' claims against the PCI receivership. Moreover, upon the recommendation of the Trustee, the PCI Receiver retained Interfor, who has identified significant overseas assets that may be recovered by the PCI Receivership, a significant portion of the proceeds of which would flow to creditors of the Estates via the Trust.

***Resolution of Boutte Litigation***

23.    Several of the largest claims against the Estates, in the aggregate amount of well over $100 million, are held by the AB Revocable Trust (the "Boutte Trust") and arise from mediation in Texas in which the Debtors were involved prior to the Petition Date. The elements underlying the mediation complaint relate to allegations akin to fraud and conversion, *i.e.,* that the Debtors sold to the Boutte Trust a series of Policies only to fraudulently spirit them away at a later date. The Trustee engaged the trustee of the Boutte Trust in settlement agreements that spanned the duration of the Chapter 11 Cases. The initial result of the Trustee's discussion was to avoid the Estates from incurring significant costs related to the Texas mediation. The ultimate

11

result of the Trustee's discussions is an agreement in principle with the Boutte Trust whereby the Boutte Trust will withdraw all claims against the Estates and pay a settlement payment to the Trust in exchange for the Trust's interests in certain contested Policies. The Trustee's actions with respect to this matter not only avoided what could have been significant litigation expense to the Estates, but likely will result in the withdrawal of over $100 million of claims against the Estates and the receipt by the Estates (now via the Trust) of a settlement payment in the amount of $185,000.

***Claims Reconciliation***

24.     In order to determine which claims should receive distributions from the Trust, and on the basis of what principal amount, the Trustee oversaw a comprehensive claims review and reconciliation process. The Trustee determined that claims against the Estates based on loan agreements (which were held by creditors as investments) should be allowed only in the principal amount loaned to the Debtors and should not include promised principal or interest. To reduce administrative and other expenses of thus reconciling claims against the Estates, the Trustee engaged on a campaign to obtain consensual reductions from creditors. Although the Trustee was able to obtain hundreds of such written consents, he also filed a series of seven omnibus objections to claims. Each of these objections was granted without significant additional cost or delay. The claims register that resulted from this process will form the basis for distributions to creditors from the Trust and, the Trustee believes, any distributions of the criminal forfeiture proceeds from the US Attorney that are not funneled through the Trust (as permitted by the Plan).

## RELIEF REQUESTED

25.     The Trustee requests entry of an order: (a) awarding total trustee compensation in the Chapter 11 Cases in the amount of $305,983; and (b) allocating (i) 78% of such award, in the amount of $238,667, to the Trustee and (ii) 22% of such award, in the amount of $67,316, to Collins. This *pro rata* allocation is based on the approximate number of months for which each party served as trustee (21 months for the Trustee and 6 months for Collins).

26.     The Trustee is aware that Collins has requested compensation separately from this Application and believes that Collins' application supports the award to Collins requested herein. Moreover, as set forth below, the Trustee believes that the allocation requested herein is a fair, reasonable, and prudent course of action for the Court to take.

## BASIS FOR RELIEF REQUESTED

27.     Section 330 of the Bankruptcy Code provides that "… the Court may award to a trustee… (A) reasonable compensation for actual, necessary services rendered by the trustee…" 11 U.S.C. § 330(a)(1). The Bankruptcy Code directs that the Court should take into account the time spent for such services, the rates charged, whether the services were necessary to administration of the Estates, and whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. 11 U.S.C § 330(a)(1)(3). Section 330 of the Bankruptcy Code further provides that "[I]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326." 11 U.S.C. § 330(a)(7).

28.     Section 326(a) of the Bankruptcy Code, in turn, provides a waterfall compensation structure above which the Court cannot award payment to a chapter 11 trustee.

13

The waterfall in section 326(a) of the Bankruptcy Code is based on "…moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor." 11 U.S.C. §326(a). Section 326(c) of the Bankruptcy Code clarifies that where more than one person has served as trustee, section 326(a) of the Bankruptcy Code limits the aggregate compensation that may be awarded to all such persons.

29.    During the course of the Chapter 11 Cases, the Trustee and Collins filed monthly operating reports and quarterly statements recording approximately $9,424,444 in disbursements. Applying the waterfall scheme of section 326 of the Bankruptcy Code, the maximum trustee compensation allowed on account of such disbursements is $305,983. In the 21 plus months of his tenure (ending on the Effective Date, for purposes of these calculations only), Trustee Marwil disbursed $9,235,140. In the 6 plus months of his tenure, Trustee Collins disbursed $189,303.[7]

***This Court Should Award the Maximum Compensation Permitted Under Section 326(a) of the Bankruptcy Code.***

30.    This Court should award the trustees full compensation in the amount of $305,983, based on the commission set forth in section 326(a) of the Bankruptcy Code, and allocate such award $238,667 to the Trustee and $67,316 to Collins.

31.    The Trustee believes that the application filed by Collins supports the award requested to Collins in this Application. Collins' application represents that Collins, among other things: (a) initiated an adversary complaint against AVIVA Life and Annuity Company; (b) procured a settlement with the receiver of W Financial Group, Inc.; (c) coordinated efforts with various state investigative and enforcement agencies; and (d) documented a settlement with

---

[7] The amount of disbursements made by Collins is based on disbursements reflected in quarterly reports and monthly operating statement filed with the Court and is different than the amount of disbursements Collins attributes to himself in his application. The Trustee believes that Collins improperly included in his calculation of disbursements amounts that remained in the Estates at the time of the certification by this Court of the Trustee's election.

14

PCI. Collins' application attaches as an exhibit invoices identifying 197.8 hours that Collins spent working as trustee; time that Collins would bill at approximately $116,000 under his normal hourly billing rate.

32.     The Trustee is primarily a restructuring attorney with more than 25 years of experience, who has served as a chapter 11 trustee (or similar independent fiduciary) in many instances. In many of these instances, Mr. Marwil is compensated as his attorney hourly rate, currently $975 per hour. Mr. Marwil maintained detailed time records for many hours spent as Trustee in these cases.[8] Invoices reflecting time the Trustee recorded for his work as Trustee are attached hereto as **Exhibit 1** and reflect 103.4 hours for a total amount of $93,167.00.

33.     While the Trustee recorded a significant amount of time on the attached invoices, due to nature of the Trustee's practice and his travel schedule, a significant amount of time spent by the Trustee was not recorded. The Trustee believes that he should receive his *pro rata* share of the maximum statutory compensation permitted, an amount in excess of his recorded time, because, among other things: (a) the Trustee will not be compensated for his services rendered as Trustee to the Trust after January 27, 2012 (the effective date of the plan), as described in greater detail below; (b) the experience, expertise, and case management skills the Trustee brought to bear on the case merit such compensation; and (c) such compensation is less that what the Trustee, or another similarly skilled professional, likely would receive if the case were not a case under chapter 11 of the Bankruptcy Code. Calculating aggregate compensation for both trustees as a commission based on distributions made also is consistent with the plain text of section 330 of the Bankruptcy Code, which provides that "[I]n determining the amount of reasonable

---

[8] Mr. Marwil also recorded time acting as an attorney for Proskauer Rose LLP in these matters, and has sought separate compensation for such time in accordance with the Bankruptcy Code and orders of this Court. The Trustee fee requested herein is in no way duplicative of the time that Marwil charged the Estates in his capacity as an attorney for the Estates.

compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326." 11 U.S.C. § 330(a)(7). Moreover, in determining trustee compensation, the language of section 330(a)(3) of the Bankruptcy Code suggest, and courts in this jurisdiction (both before and after implementation of section 330(a)(3) of the Bankruptcy Code under BAPCPA, have been clear that a *Lodestar* analysis of multiplying hours by professional hourly rate is a consideration, but not the Court's sole consideration. See *In re Stoecker*, 118 B.R. 596, 602 (Bankr. N.D. Ill. 1990); see also *In re Phillips*, 392 B.R. 378 (Bankr. N.D. Ill. 2008) (discussing standard of review for trustee applications, in context of chapter 7 fee application, post BAPCPA amendments).

34.     Comparing the length of their time as trustee, Mr. Marwil's request is significantly less than the amount Collins identifies as having billed at his hourly rate in his application. Moreover, Mr. Marwil's experience is that (a) outside of chapter 11, a fiduciary acting in a capacity similar to a chapter 11 trustee likely would have charged a flat monthly fee plus expense reimbursement; and (b) any individual acting in such a capacity with experience similar to Mr. Marwil's would have charged a flat fee that would significantly exceed the maximum fee that may be awarded under section 326 of the Bankruptcy Code.[9]

35.     As referenced above, the Trustee will receive no compensation for services that have been rendered after the effective date of the Plan and that will continue to be rendered as trustee of the Trust. The Trustee will not receive compensation on account of future amounts collected by the Trust and distributed to creditors, which would be included in a calculation of the Trustee's fee under the Bankruptcy Code. As described above, the Trustee expects that the

---

[9] Taking into consideration the maximum fee allowed by Section 326 of the Bankruptcy Code and the duration of Mr. Marwil's service as Trustee, a monthly flat fee in the amount of only $14,000 would be comparable to the maximum compensation permitted by section 326 of the Bankruptcy Code. Mr. Marwil receives significantly more than that in another matter on which he currently serves as an independent fiduciary.

16

Trust will collect and distribute to creditors a significant amount on account of, among other assets, distributions from the PCI receivership on account of the Trust's $91 million claim. The Trustee will continue to actively oversee the PCI receivership case to ensure that it is administered efficiently to maximize returns to the Trust, which likely will be the largest creditor of the PCI estate. The Trustee continues to work closely with the PCI receiver and Interfor to search for offshore funds that may be collected directly by the Trust or collected by the PCI Receiver for subsequent distribution to the Trust via the PCI receivership. The Trustee is coordinating with the Office of the US Postal Inspector and the United States Department of Justice in preparation for testifying in the trial of Minor Vargas. The Trustee also has and will continue to work with the government to coordinate distribution of proceeds of assets seized by the government to creditors of the Estates. As set forth in the Plan and related disclosure statement, these proceeds will either be distributed by the Trustee via the Trust (at no cost to creditors), or by the government directly with information provided by and cooperation of the Trustee. Finally, the Trustee will continue to monitor and attempt to monetize other assets of the Trust, including a multi-million dollar allowed claim against the Colson chapter 7 estate.

36.    The Chapter 11 Cases required the full breadth of the Trustee's significant experience and ability. The Trustee directed every action of his attorneys and other professionals for nearly two years. To make these decisions, the Trustee regularly met and conferred with his attorneys, predecessor Trustee Collins, representatives of PCI and the PCI Receiver, representatives of multiple insurance companies that issued Policies, potential purchasers of Policies, individual creditors and their attorneys, and myriad representatives of the federal government and state and local governmental units, among others. The Trustee coordinated legal and business strategies with the US Attorney and receivers for PCI as well as other estates. The

17

Trustee's experience from previous matters not only streamlined the Estates' significant interactions with all of the entities mentioned above (especially the office of the US Attorney and the Department of Justice, offices with whom the Trustee had worked previously), but allowed the Trustee to administer the Estates in a manner that minimized the legal and other expenses incurred for the benefit of the Estates. The Trustee will continue to bring these skills to bear for the benefit of creditors of the Trust, at no additional cost.

37.     The amount requested herein is fair and reasonable under sections 326 and 330 of the Bankruptcy Code. The amount requested herein is not duplicative of any amounts awarded (or that may be awarded) to Mr. Marwil for fees charged the Estates in his capacity as an attorney.

***The Court Should Allocate Any Award Based on the Duration of Each Trustee's Respective Time as Trustee.***

38.     Section 326(a) of the Bankruptcy Code states that moneys "disbursed or turned over" to the debtor are excluded from the determination of a cap on trustee compensation. 11 U.S.C. § 326(a). This language could be interpreted to limit compensation to Trustee Collins to an amount calculated from disbursements made while Trustee Collins served as Trustee. Using disbursements reported to the Court on monthly operating reports, the maximum trustee fee payable to Collins would be $12,715 (on account of $189,303 of reported disbursements by the Estates prior to March 8, 2010). Another reading of this language, however, is to recognize that a trustee can turn money over to a Debtor (so that the property is no longer property of the chapter 11 estate) and, as to Trustees Marwil and Collins, to focus on the language of section 326(c) of the Bankruptcy Code. This language limits aggregate compensation to Trustees Marwil and

18

Collins to the amount calculated to section 326(a) of the Bankruptcy Code, and leaves for determination by this Court how to allocate that amount between the Trustees.

39.     The Trustee believes that the most prudent method for allocating any trustee award between himself and Collins is to pro rate such award between trustees based on the duration of their time as trustee. The Bankruptcy Code's focus on disbursements (in the case of one chapter 11 trustee) serves the purposes of limiting trustee compensation and assuring creditors that they will receive the bulk of proceeds of property of the estates. Between trustees who served different terms, however, a focus on disbursements (a) is unfairly tilted in favor of whoever served as trustee towards the end of the case (here Marwil) and (b) fails to account for myriad acts necessary to administer the estate that are not directly related to turning assets into cash (which include, among other things, claims reconciliation, communications to investors, plan negotiations and confirmation, etc…).

40.     The Trustee and his counsel requested (via counsel to Collins) that Collins also request that the Court pro rate any award based on duration of tenure as Trustee. Collins declined this request.

## **NOTICE**

41.     The Trustee has served this Application upon: (a) the Office of the United States Trustee; and (b) all parties that have requested service in the Chapter 11 Cases.  The Trustee also has posted this Application to the website dedicated to the Chapter 11 Cases maintained by GCG. The Trustee requests that the Court determine this notice is adequate and sufficient under the circumstances.

19

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

A.     Granting him compensation in the amount of $238,667 for services rendered as Trustee on behalf of the Estates;

B.     Granting Collins compensation in the amount of $$67,316 for services rendered as trustee on behalf of the Estates;

C.     Authorizing the Trustee to pay to himself and to Collins such amounts from assets of the Trust; and

D.     Granting such other and further relief as the Court deems equitable and just.

Dated:  February 17, 2012                    Respectfully submitted,

                                             */s/ Jeremy T. Stillings*
                                             _____

                                             Jeremy T. Stillings (ARDC# 06279868)
                                             PROSKAUER ROSE LLP
                                             70 West Madison, Suite 3800
                                             Chicago, Illinois 60602-4342
                                             (312) 962-3550, (312) 962-3551 (Fax)

                                             *Counsel to the Trustee*

20